**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | | |
|---|---|---|
| **CHRISTOPHER ANDRÉ VIALVA,** | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | |
| | ) | **CIVIL ACTION** |
| **vs.** | ) | |
| | ) | **Appeal No.: 20-2710** |
| **WARDEN, USP-TERRE HAUTE,** | ) | |
| | ) | **DEATH PENALTY CASE** |
| **UNITED STATES OF AMERICA,** | ) | **EXECUTION SCHEDULED FOR** |
| | ) | **SEPTEMBER 24, 2020** |
| **Respondents-Appellees.** | ) | |

**PETITIONER'S REPLY TO RESPONDENTS'**
**OPPOSITION TO EMERGENCY MOTION FOR STAY**
**OF EXECUTION PENDING APPEAL**

The Government has ignored the fact the Attorney General of the United States set an execution date for Mr. Vialva only 55 days from the date of notice.[1] The Government does not deny Mr. Vialva has been actively seeking review of his post-conviction claims by the federal courts for the last 16 years, with his last attempt concluding just earlier this year. Mr. Vialva simply seeks adequate time to obtain redress from this Court for Constitutional claims that have never been

---

[1] On August 14, 2020, Mr. Vialva filed in the Western District of Texas a Motion to Enjoin the Federal Bureau of Prisons and the United States Marshals Service from Executing Mr. Vialva Without Legal Authority and in Violation of State Law. *See United States v. Vialva*, Case No. W-99-CR-00070(1), Dkt. 675 (W.D. Tex. Aug. 14, 2020). The 55-day notice of Mr. Vialva's execution violates Texas law, which provides an execution date will be set no fewer than 91 days from a court order setting execution. *Id.* at 8-10. By failing to comply with the laws of Texas, the Attorney General's notice of Mr. Vialva's execution violates the Federal Death Penalty Act, 18 U.S.C. § 3596. *Id.* In addition to violating the law of Texas which secures Mr. Vialva a minimum of 91 days, the abbreviated schedule is significantly shorter than the 137 days initially afforded Daniel Lee and the 139 days initially afforded Lezmond Mitchell. *See United States v. Lee*, 2020 WL 3921174 at *1 (E.D. Ark. July 10, 2020); *United States v Mitchell*, 2020 WL 4815961 at *1 (9th Cir. Aug. 19, 2020). On September 11, 2020, the district court denied Mr. Vialva's motion. *See United States v. Vialva*, Case No. W-99-CR-00070(1), Dkt. 690 (W.D. Tex. Sept. 11, 2020). The following day, Mr. Vialva filed a Notice of Appeal. *See id.* at Dkt. 692.

afforded a meaningful opportunity for review.  Mr. Vialva respectfully requests his Emergency Motion for Stay of Execution be granted.

The Government argues against a stay by claiming Mr. Vialva cannot demonstrate a likelihood of success on the merits because "Vialva's previously litigated constitutional claims do not fall within the narrow categories of the claims that this Court has concluded are permitted by the savings clause," (Doc. 13 filed Sept. 15, 2020) pointing to three cases: *In re Davenport*, 147 F.3d 605 (7th Cir. 1998); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (*en banc*). As argued in Mr. Vialva's Opening Brief, § 2241 does not lend itself to such a mechanistic approach.  The Savings Clause provides a remedy when § 2255 has proved inadequate or ineffective, an analysis that requires scrutiny of the specific facts and circumstances of a particular case.

The Government's reliance on applying "narrow categories" in assessing § 2241 petitions is neither proper nor consistent with this Court's precedent.  In *Davenport*, the Court set out a three-part test to determine when § 2241 is available to inmates affected by changes to the Armed Career Criminal Act.  147 F.3d at 611-12.  If this Court followed the Government's logic, *Davenport* established a "category" of habeas claims allowed by § 2241.  But only three years later when *Garza* was decided, this Court did not reject it out of hand simply because it did not fit the "narrow category" of *Davenport*.  Instead, the Court examined the particular circumstances of the case to determine whether the essential function of § 2255 was impaired.  After determining that it was, the Court crafted a remedy under § 2241 to address the inequity in Mr. Garza's case.  253 F.3d at 922-25.

As discussed in Mr. Vialva's Opening Brief, the *en banc* Court did not merely dismiss Mr.

2

**Petitioner's Reply - Attachment 1**

Webster's arguments by rote application of the case "categories" in *Davenport* and *Garza*. Instead, the Court examined the circumstances of the case to determine whether § 2255 was inadequate or ineffective. The Government advanced the same argument it is now making. *See Webster v. Caraway*, No. 14-1049 (7th Cir. Apr. 30, 2014), Dkt. 15 at 44 (section entitled "Webster's claim is unlike the narrow band of cases that satisfies the savings clause.") (district court below).

Savings Clause jurisprudence simply does not bear out the limitations the Government seeks to impose. *See, e.g., Brown v. Caraway*, 719 F.3d 583, 585 (7th Cir. 2013) (rejecting district court's reliance on *Davenport* to require showing of innocence to invoke § 2241 and finding jurisdiction on sentencing issue); *Beason v. Marske*, 926 F.3d 932, 935-38 (7th Cir. 2019) (describing the various ways in which § 2241 jurisdiction has been found); *Fulks v. Krueger*, No. 2:15-cv-00033, 2019 WL 4600210, at \*14 (S.D. Ind. Sept. 20, 2019) ("The Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found.").

Access to the § 2241 remedy does not depend on a petitioner raising the identical facts as a prior, differently situated litigant. The issue is whether a petitioner has had "a reasonable opportunity to obtain a reliable judicial determination" of the legality of his conviction or sentence. *In re Davenport*, 147 F.3d at 609. The standard has been articulated in several ways in this circuit, but the focal point has remained the same: Some structural problem, some "glitch," or some "lacuna" in the implementation of the § 2255 statute must have prevented the petitioner from securing meaningful review of the error. *See Webster*, 784 F.3d at 1136; *Beason*, 926 F.3d at 939.

Further, the fact that Mr. Vialva's § 2241 petition includes claims previously presented in his § 2255 motion does not preclude his access to relief. Citing *Roundtree v. Krueger*, 910 F.3d 312, 313 (7th Cir. 2018), the Government argues "[a]bsent an intervening and retroactive change in

3

governing law, a federal prisoner cannot relitigate a claim under § 2241 that was actually resolved in a proceeding under § 2255." Doc. 13 at 13. *Webster* and *Garza* make clear the Government's argument based on *Roundtree* is not without exception.

In *Webster*, the *en banc* Court did not simply dismiss a § 2241 petition because it involved the same claim raised in a § 2255 motion. Mr. Webster had unsuccessfully raised the claim of his exemption from the death penalty due to intellectual disability in his § 2255 motion. *See Webster*, 784 F.3d at 1138; *Webster v. United States*, No. 4:00-cv-1646, 2003 WL 23109787, at *4, 14 (N.D. Tex. Sept. 30, 2003) (noting the § 2255 motion alleged "Webster is ineligible to be executed because he is mentally retarded," and denying such claim after applying *Atkins v. Virginia*, 536 U.S. 304 (2002)). Evidence discovered after the § 2255 proceedings concluded strengthened Mr. Webster's *Atkins* claim. He sought authorization in the Fifth Circuit to file a successive motion under § 2255(h)(1) claiming he was innocent of the death penalty. The Fifth Circuit denied authorization based on a narrow reading of § 2255(h)(1). *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010).

Following denial of certiorari, Mr. Webster filed a petition under § 2241 in the Southern District of Indiana, based on the new evidence. Both the District Court and a panel of this Court denied jurisdiction. The *en banc* Court reversed, holding there was a "lacuna" in § 2255 that failed to account for the narrow set of cases, such as Mr. Webster's, that presented issues of Constitutional ineligibility for execution. *Webster*, 784 F.3d at 1138. Given that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence," and "there is no reason to assume that our procedural system is powerless to act in such a case," the Court held there was no bar precluding resort to § 2241. *Id.* at 1139.

In *Garza*, this Court found § 2241 conferred jurisdiction to consider the legality of a

4

prisoner's death sentence despite the fact his petition involved a claim similar to one raised in his § 2255 motion. The factual basis for jurisdiction under § 2241 was a report issued by the Inter-American Commission on Human Rights advising Mr. Garza's human rights had been violated and recommending his death sentence be vacated. 253 F.3d at 923. The report was based on evidence supporting a claim Mr. Garza raised in his prior post-conviction proceedings. *Id.* at 920. This Court found Mr. Garza had no previous opportunity to present the Commission's report and recommendations at his trial or in his post-conviction proceedings and was thus entitled to review under § 2241. *Id.* at 922.

Mr. Vialva recognizes "something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster*, 784 F.3d at 1136. Mr. Vialva's § 2241 petition demonstrates that the specific circumstances of his case deprived him of a meaningful opportunity to obtain review of the claims he presents. As Mr. Vialva argued in his Opening Brief and § 2241 petition, Judge Smith's alcohol abuse and other misconduct during the period in which he presided over Mr. Vialva's trial and § 2255 proceedings precluded an untainted opportunity for meaningful review of Mr. Vialva's claims. *See Purkey v. United States*, 964 F.3d 603, 617 (7th Cir. 2020) ("The idea of an entitlement to *one* untainted opportunity to make one's case is deeply embedded in our law."). In response to the numerous revelations about Judge Smith, the Government argues "there was no basis to infer that Judge Smith was unable to resolve the criminal-law questions presented in Vialva's § 2255 motions in 2012, 14 years after the judge engaged in unrelated misconduct and two years before the investigation into that misconduct began." Doc. 13 at 14-15. The Government's argument ignores that the allegations of misconduct against Judge Smith dated from 1998, shortly before Mr. Vialva's capital trial, and persisted through 2015, a few

5

years after Judge Smith summarily denied Mr. Vialva's § 2255 motion.  These allegations went far beyond the "unrelated conduct" (Doc. 13 at 14) of Judge Smith's unwanted sexual advances to a court employee in 1998; the judicial investigation discovered evidence that Judge Smith was likely intoxicated during the work day, that he was "not functioning," that he was "falling apart," and that he was not even able to get himself to the courthouse.

The Government asserts Mr. Vialva's argument "about Judge Smith's purported impairments relies on misrepresentations about the record,"[2] referring to its Response Brief (Doc. 14), at pages 33 through 34. Doc. 13 at 16.  The Government is wrong. In its Response Brief, the Government asserts "the 'evidence Judge Smith was intoxicated during the word day' (Br. 12) consisted of testimony from [sic] single witness who testified that Judge Smith had a "reputation for drinking" but only smelled alcohol on one day in 1998 and "d[idn't] know whether it was mouthwash or liquor.'" Doc. 14 at 34.  The Government's argument fails to account for important follow-up questions to the court employee who reported Judge Smith sexually assaulted her during work hours:

> Q:      Let me back up a little bit. You mentioned it smelled like mouthwash or liquor.  Did you see or hear anything else that'd give you the impression he might have been intoxicated? Or did you mention to anyone else that you thought he might have been intoxicated?
> A:      Yes, I did.
> Q:      Who did you tell that you thought he might have been intoxicated?
> A:      I told – I told my supervisor, the district clerk, in San Antonio. They called me about the situation. And when I told them, I told them that I did smell liquor on his breath.
> Q:      Okay.
> A:      And I was pretty certain it was that. And they asked, you know, "Are you sure it wasn't mouthwash and" and you know, but it –

----

[2]Mr. Vialva has made the same arguments regarding Judge Smith's impairments since late 2017. *See United States v. Vialva*, Case No. W-99-CR-70(1), Dkt. 553 (Oct. 13, 2017, W.D. Tex). Never once before has the Government asserted these arguments have relied on misrepresentations of the record.

Q:      It smelled like liquor to you?
A.      Yes.

Att. 1 (Oral Deposition of Witness A, March 7, 2014) at 3.[3]

Next, the Government disputes the accuracy of the following statement from Mr. Vialva's

Opening Brief: "One of Judge Smith's law clerks asked the employee for help managing

Judge Smith's behavior, complaining that he was 'not functioning' and 'falling apart.' The

law clerk stated Judge Smith was not even able to get himself to the courthouse." Doc. 14

citing Doc. 9-1 at 12;  But again, the Government is wrong.  *See* Att. 1 at 6.  The Government

attributes the law clerk's description of Judge Smith's condition to his "high blood pressure

and chest pains." Doc. 14 at 34, but "Witness A" provides context for the judge's alleged

health issues:

> Q:      I believe you told me that sometime while you were on leave you got
> a call from Judge Smith's law clerk?
> A:      Yes. . . . He was Judge Smith's law clerk, and he called me the week
> after that.  It was I would say, a week, maybe two – no probably two
> weeks just because of the events that he said had been – had been
> happening. . . he called me at home, and he said "Witness A" he said
> "You need to put some closure on this. You need to do something about
> this." He said "The judge is – I'm having to go pick him up for work.
> He can't come into work. He's been in the hospital." He said "He's,
> you know, falling apart.  He having to cancel court things, and, you
> know, he's not functioning. You've got to do something about this." .
> . .
> Q:      So he was suggesting it was your responsibility?
> A:      Yes. . . . And I was like – I said "Law Clerk, I'm the victim here. He
> did this to me. Why – you know, what – you're not even in your right
> mind to call and tell me to make things better, you know, about this."

---

[3]This deposition was contained within the exhibits attached to Mr. Vialva's § 2241 petition.
*See* Dkt. 1-7 (district court below). It is attached here for the convenience of the Court.

> And he's like, "Well, you just need to do something because I can't do this anymore." In other words, he was feeling the stress of it.
>
> Q:    So what did he say he wanted you to do?
>
> A:    He – I don't know. He wanted me to - to call and make things better, I suppose. I don't know.

With respect to Mr. Vialva's underlying claims, the Government argues he is "not likely to prevail on the merits of any of the claims raised in his Section 2241 petition," and chastises Mr. Vialva for not "specifically argu[ing] otherwise in his stay motion." Doc. 13 at 23. The Government's argument overlooks that the District Court denied Mr. Vialva's § 2241 petition and stay motion "without reaching the [underlying] merits." Dkt. 20 1 (district court below). Hence, Mr. Vialva's appeal before this Court addresses only his entitlement to jurisdiction under § 2241, and his request for relief is a remand to the district court for consideration of his claims.[4]

Mr. Vialva amply demonstrated he did not unnecessarily delay filing his § 2241 petition. The fact "the government announced its intention to resume federal executions over a year ago" (Doc. 13 at 18) does not establish Mr. Vialva unnecessarily delayed bringing his claims. At the time the Government announced it was resuming federal executions, Mr. Vialva was still seeking review of his Constitutional claims. *See* Dkt. 10-1 at 8-9 (district court below). The Government acknowledges Mr. Vialva "spent some of the intervening time litigating his Rule 60(b)(6) motion" (Doc. 13 at 17) but complains: "Even so, the Supreme Court denied certiorari on that motion on January 13, 2020. [Citation omitted.] The government then waited an additional six months before scheduling his execution. Only then did Vialva file his habeas petition." Doc. 13 at 17. However, as the Government admitted below, Dkt. 11 at 43, in March of this year the impact of the COVID-19

---

[4]The Government also ignores the District Court's characterization of Mr. Vialva's conflict of counsel claim as "a significant claim." Dkt. 20 at 7 (district court below).

pandemic required the District Court to close for a short time.[5]

The Government claims Mr. Vialva "should not be permitted to wait until his execution is scheduled to file a 105-page habeas petition . . . and then, 'by the very act of delay, justify postponement of the execution.'" Doc. 13 at 18 (quoting *Lee v. Watson*, No. 19-3399, 2019 WL 6718924, at *1-*2 (7th Cir. Dec. 6, 2019)).  In *Lee*, this Court vacated a stay issued by the District Court below during the petitioner's § 2241 proceedings because "the likelihood of success is slim." *Id.* at *1.  The Court made "[o]ne further observation": "Lee did not attempt to use § 2241 for more than four years after the Eighth Circuit rejected the last of his contentions . . . . Even after an execution date was set, he waited a further two months to seek a writ of habeas corpus." *Id.* at *2. *Lee* is inapposite to Mr. Vialva's case: Mr. Vialva filed his § 2241 petition seven months after the resolution of his Rule 60(b)(6) motion and ten days after receiving notice of an execution date.

Mr. Vialva has already shown why the Government's reliance on *Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007) to argue Mr. Vialva engaged in "dilatory tactics" (Doc. 13 at 18) is misplaced.  *See* Doc. 10-1 at 9.  The Government offers nothing to rebut the critical distinctions between *Lambert* and Mr. Vialva's case.

In its attempt to dissuade the Court that the balance of harm weighs in Mr. Vialva's favor, the Government relies on *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019).  Doc. 13 at 19.  Unlike Mr. Vialva's § 2241 petition, *Bucklew* involved a § 1983 action in which the petitioner challenged Missouri's lethal injection protocol. 139 S. Ct. at 1118-19.  Similar to the petitioner in *Lambert*, Mr.

---

[5]Mr. Vialva filed a challenge to the Constitutionality of the federal death penalty protocol in the District of Columbia before the Government announced his execution date. *See Vialva v. Barr, et al.*, Case No. 1:20-cv-01693-TSC, Complaint (D.D.C. June 22, 2020), consolidated with *In re Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Case No. 1:19-mc-00145-TSC (D.D.C.).

**Petitioner's Reply - Attachment 1**

Bucklew did not raise his claim until less than two weeks before his scheduled execution. *Id.* at 1119. In contrast to the petitioners in *Lambert* and *Bucklew*, Mr. Vialva filed his § 2241 petition 44 days before his scheduled execution date, just ten days after receiving notice from the Government of that date.

The Government argues, "Once postconviction proceedings 'have run their course,' as they have here, 'finality acquires an added moral dimension.'" Doc. 13 at 19 (quoting *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)). Here, post-conviction proceedings have not run their course. In *Calderon*, the Court made clear it was "concerned with cases where, as here, a court of appeals recalls its mandate to revisit the merits of its earlier decision denying habeas relief. In these cases, the State's interests in finality are all but paramount . . . ." *Id.* at 557. The Court explained that "[t]he prisoner has already had extensive review of his claims in federal and state courts." *Id.* at 557. Such is not the case here.

The Government argues, "The government's interest in implementing Vialva's sentence is magnified by the 'heinous' nature of his crimes. . . . Vialva was the ringleader of the brutal murders of Todd and Stacie Bagley." Doc. 13 at 19 (citation omitted). As argued in his § 2241 petition, if Mr. Vialva had the effective assistance of counsel guaranteed to him by the Sixth Amendment, he could have effectively rebutted the Government's theory he was the "ringleader." *See* Dkt. 12 (district court below). Without a stay, Mr. Vialva stands to be executed without review of this and other significant Constitutional claims.

10

**Petitioner's Reply - Attachment 1**

Respectfully submitted,


*s/ Emma V. Rolls*
Emma V. Rolls, OBA #18820
Michael W. Lieberman, OBA #32694
Assistant Federal Public Defenders
Office of the Federal Public Defender
Western District of Oklahoma
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102
Telephone: (405) 609-5975
Facsimile: (405) 609-5976
emma_rolls@fd.org
michael_lieberman@fd.org
Counsel for Christopher Vialva


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the Seventh Circuit using the CM/ECF system on September 16, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Emma V. Rolls*
Emma V. Rolls

11

**Petitioner's Reply - Attachment 1**