March 7, 2014

CAUSE NO.

| | | |
|---|---|---|
| COMMISSION FOR LAWYER DISCIPLINE, | )( | IN THE DISTRICT COURT |
| | )( | |
| Plaintiff, | )( | |
| | )( | |
| VS. | )( | 380th JUDICIAL DISTRICT |
| | )( | |
| COMPLAINANT | )( | |
| | )( | |
| Defendant. | )( | COLLIN COUNTY, TEXAS |

---

ORAL DEPOSITION OF

WITNESS A

MARCH 7, 2014

VOLUME 1 OF 1

---

ORAL DEPOSITION OF WITNESS A , produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 7th day of March, 2014, from 2:52 p.m. to 3:45 p.m. before Court Reporter , Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at Address Waco, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Court Reporters

March 7, 2014

## Page 2

APPEARANCES

FOR THE PLAINTIFF:

Attorney for the Texas Bar

FOR THE DEFENDANT:

, DEFENDANT PRO SE
ATTORNEY AT LAW

## Page 3

INDEX

Page

Appearances ............................................... 2

WITNESS A
    Direct Examination by Complainant ................ 4
    Cross-Examination by Attorney for Texas Bar . 29
Changes and Signature ..................................... 31
Court Reporter's Certificate ............................. 33

## Page 4

COMPLAINANT      : This is Complainant It is March 7th at 2:52 p.m. Going on the record. With me in the room are Court Reporter, Witness A's husband and Witness A the witness. On the telephone is Attorney for the Texas Bar

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY COMPLAINANT

Q   Witness A could you please state your full name?

A   Witness A

Q   And were you formerly known as Witness A?

A   Yes.

Q   What years did you work in the Federal Courthouse?

A   Um --

Q   Just about --

A   About '94 through '98.

Q   Were you a deputy clerk?

A   Yes.

Q   I want to ask you about an attempted sexual assault that you and I discussed previously. When approximately did that occur?

A   Around 1998, I believe. It's been so long --

Q   Sure.

A   -- I can't remember the exact date.

Q   When -- on that particular day do you remember when

## Page 5

you first saw Judge Walter Smith?

A   Yes.

Q   And that would be U.S. District Judge Walter Smith, correct?

A   Correct.

Q   Describe when you ran into him and what happened.

A   It was in the morning. It was about 8:30, and I had went down to the water fountain down the hall on the third floor, which is where the clerk's office is and also the judge's office and courtroom. And I went to rinse out my cup, get some water. And about that time Judge Smith came up the stairs, entering the building, coming in for the day. And he stopped and talked to me, "Hi, how are you?" And, really, I had never had a conversation with him, per se. We never crossed paths. The --

Q   Before that time?

A   Right. I mean, I hardly ever saw him even though we were on the same floor. But this morning he had -- this particular morning he had a pretty strong smell -- I don't know whether it was mouthwash or liquor, but it was pretty strong on his breath. And he -- when he was talking to me. He told me that -- he said, "Come see me sometime." I believe that's the exact words he used. And I was like, "Okay." I kind of thought it was strange. It was kind of a strange request. And so I figured it was, like, you know, come by the

Court Reporters

March 7, 2014

Page 6

office and say "hi" sometimes or something. I don't know. That's kind of the way I took it.

Q Right.

A And I said, "Okay," and anyway --

Q What did you do after that?

A I went back to my desk and started working, and I had some training that I had to do. I can't remember if it was an online, but it was something that was piped in that -- training that I did. And I had to go down to the second floor in a room for that, and I was gone the majority of the morning doing that training. I got out about lunch.

Q Let me back up a little bit. You mentioned it smelled like mouthwash or liquor. Did you see or hear anything else that'd give you the impression he might have been intoxicated? Or did you mention to anyone else that you thought he might have been intoxicated?

A Yes, I did.

Q Who did you tell that you thought he might have been intoxicated?

A I told -- I told my supervisor, the district clerk, in San Antonio. They called me about the situation. And when I told them, I told them that I did smell liquor on his breath.

Q Okay.

A And I was pretty certain it was that. And they

Page 7

asked, you know, "Are you sure it wasn't mouthwash and --" you know, but it --

Q It smelled like liquor to you?

A Yes.

Q Okay. So you went to this training session. And then what happened after that?

A I came up to my desk, and immediately my phone rang. And he said, "Where have you been?"

Q You say "he." You mean Judge Smith?

A Judge Smith was on there. He said, "Where -- where have you been? And I said -- he said, "I told you to come see me." And I said, "I had to go to training." I mean, it just -- really, I mean, he'd never called my phone before, my extension, you know. It just really caught me by surprise, and he -- he said, "I told you to come see me." I said, "Well, I didn't mean -- I didn't realize you meant right now." And he said, "Yes, I mean right now. Just come over and tell Employee A that you need to speak to me," which is his secretary. So I was kind of, like, "Okay." So I went over to his office, and his door was closed. I went -- Well, Employee A was sitting right outside his office at her desk, which she's his secretary. And I said -- I -- I said -- I just told her what he told me to say, "I need to see Judge Smith." And so she said, "Okay." And she opened -- she said, "Go ahead and knock on the door," you know. So he came over and opened the door.

Page 8

And when I went inside I walked in, and he's like, "Come in, come in." And he went behind me and closed the door. And I felt really nervous, but I thought -- you know, about the same time as this happened his -- his courtroom deputy clerk -- or courtroom clerk was retiring, and I knew that position was coming open. I didn't know if maybe -- you know, maybe he was talking -- that's the only thing I could even think of that he would want -- that we would have in common for him to talk to me about.

Q What -- what did he do after that?

A He basically came over to me and put his arms around me and kissed me, and I just froze. I couldn't move. And he said, "Let me make love to you." And I -- and I -- I just freaked out and --

Q Well, did you say anything to him?

A I said -- I said -- it's just stupid. I said, "Right now?" That's what I said. I don't -- I was like, "What? Right now? What?" like that was even the issue. And he said, "Yeah." He said -- And then he -- he pulled me to him again, and he kissed me again and stuck his tongue down my throat, and he pressed himself against me. I could tell he had an erection, and he said, you know, "A couch right here." I'm like -- I was just freaked out. I felt like I was in a -- like, I could hear what he was saying, but it was in -- it was distant.

Page 9

Q Did he --

A I just panicked, and all I thought about was his anger, you know. And I was like how am I going to get out of here without making him angry?

Q Did he -- did he grab you with his hands?

A Yes.

Q What -- what did he do with his hands?

A I mean, he -- he put his arms around me and, you know, just pulled me close and held -- you know, wouldn't let me go.

Q Was he groping you anywhere?

A Yeah. I mean, but --

Q I know this is difficult, and I apologize. But do you mind saying where he groped you?

A Well, I just -- I just remember he just put his arms around me, around my back, and then lower. And then he started to try touch my breasts, and I kind of pushed away and said -- I said, "I -- I need to go." I said, "They're going to be wondering where I'm at in my office. My manager doesn't know where I'm at, so they're going to be wondering where I'm at. I need to get back to my desk." And he's like -- he said, "No, you don't. I'll take care of that." He said, "You just --" he said, "Just let me make love to you, and I have this couch over here." And I'm like -- I was like, "Your wife works in this building. Your --" I mean, I came up -- such

3 (Pages 6 to 9)

March 7, 2014

Page 10

weird things came out of my mouth, you know. And in hindsight, you know, I wish I would have said things differently, but I was like -- I -- I was just trying to keep him from blowing up at me because I could tell he was very -- he was agitated because I had not come in there earlier that morning. He was already agitated, and I could feel that, you know, and --

Q  Did he have a reputation for having a temper, being angry?

A  Uh-huh.

Q  Is that a "yes," he did?

A  Yes.

Q  Okay. Did he have a reputation for drinking?

A  Yes. I found -- I -- Yes.

Q  Okay. And so after that last conversation you just described, did he try to grab you again, or did he physically touch you after that?

A  He just took my hand, and he was like, you know, "Just come stay with me in here for a while," and I was just like, you know, "I -- I've got to get back to my desk. I've got to --" I don't really remember too much of what I said. I was just trying to get out of there and --

Q  Okay. You want to take a break?

A  No.

Q  So where did you go? Did you talk to anybody right

Page 11

after you left his office?

A  When I went out of the office, he -- he told me to shut the door behind me and that -- I don't really even know how I got him to allow me to get out of the office. I don't remember exactly what I said. But Employee A was there, and I just told her "Hi." I mean, I felt like I was going to pass out. I knew she could tell something was wrong, but I didn't say anything, you know. And I went back to my desk. And my coworker, Employee B came by my desk. And I was just sitting there. I was just sitting in my chair, just -- I don't know. I couldn't even -- I just felt numb. And she said, "What is wrong with you? You look like you've seen a ghost." She said, "You're pale. You're -- What is wrong?" And so she said, "Meet me down at the bathroom." We had a particular bathroom on the third floor that was women only and it was locked and only we had a key to it. And so I went -- she went down there, and then I came down there a little later and told her what happened.

Q  So you told about what Judge Smith had done?

A  Uh-huh.

Q  Did -- what -- did she advise you or suggest that you do anything?

A  She was just in shock, and I don't remember what she said.

Q  Sure, sure. So after that, after you spoke with

Page 12

her, I guess you went back to your office?

A  Yes. And he called me again in the afternoon.

Q  You said "he." You mean Judge Smith?

A  Judge Smith. And asked me, "Take off --" he said, "Take off a couple of days. Take off a couple of days of work. I want to take you somewhere." And I said, "Well, I don't really have that many days, you know, available." I said I'd been sick, and so I'd had to take my sick leave. And, plus, I don't care how many days I had available, I wasn't going to tell him --

Q  Sure.

A  -- "Oh, sure, let me just block off one of my weeks for you," you know. But he was like, "I want to -- just -- just take off a few days. I'll take care of it," you know, "I'll make sure that, you know, you can have the time off and you'll get paid and everything." And I don't remember how the conversation ended.

Q  Did you stay the rest of the day or go home?

A  I stayed the rest of the day. And that evening I just -- It -- it happened on a Thursday. I know that for sure because on Fridays my schedule was to come in at one o'clock. And so Friday before I came in I called my boss, Employee C, there at the district clerk's office and said -- I told him what happened. And I said, "Please don't leave me alone with him." I said, you know, "I'm afraid," you

Page 13

know, "He's propositioned me. He's very adamant about it, and he's not even thinking no is an option, or he doesn't even think that I just don't want him," you know, how could I -- I mean, that just wasn't even a -- it's like how could I not be so indebted to him for him making that offer is the way I felt, you know. And so my boss was like -- you know, he got real quiet, and he was like, "Okay." Well, then I came in at one o'clock. And when I walked in, there was a dozen yellow roses on my desk, a big ol' thing. And I just -- I felt like I was going to faint. And my boss was sitting up front. We had a metal table there. And he was just opening the mail and distributing it. And I just looked at him, and he looked at me because he knew exactly what it was.

Q  You mean Employee C?

A  Employee C And right after -- it was -- I guess he had -- the judge had watched me come in the building, and he paged my desk, and he said, "Where have you been? I've been waiting on you to get here all day. Where have you been?" And I told him, "I don't come in till one o'clock," you know, which was a pretty -- I think I had started doing that, you know, within the last six months or so, so it was fairly new for me, my schedule. And I said, "No, you should not have sent these. You should not have sent these." He's like, "Well, sent what?" And I'm like, "You know what I'm talking about. You should not have sent these. It's just --

4 (Pages 10 to 13)

Court Reporters

March 7, 2014

Page 14

you know, it's not right." And he's like, "Well, I just had to. I just had to," you know. And, you know, just kind of nonchalantly like -- I don't know. Then he asked me to take off again. But then he came over to -- from his office to -- the district clerk's office. And my desk is right -- when you walk in the district clerk's office door, you can see my desk. And he came in and he asked Employee C who was sitting up in the front -- and his office is way in the back of the -- the room. He asked -- he came in and said, "Employee C I need you to go look up -- what was the juror's -- juror number seven on this trial," and he gave a trial number and stuff. And -- and was like, "I don't know, Judge. I'll go find out."

Q   So he left you there?

A   And he left me there, and he just -- he -- So the judge comes right over to me, you know.

Q   Right.

A   And I don't remember what happened right then. I was just -- I remember being so mad that he left me in there. And, I mean, it was just -- that's something that he would have -- he was in there digging for for 30 minutes. And he finally came out and said, "I can't find it, Judge, but when I find it I'll bring it." "Okay, Employee C That's fine." And so anyway I -- and then he -- later on he came -- or he called my extension and asked me what I was doing that weekend. I said, "I'm going to see my grandparents." And he said -- anyways

Page 15

he -- he dropped by and he -- he left a note, "I hope you have a pleasant weekend," on my desk. And I just decided that I -- over the weekend I wasn't going to come back. I was quitting my job.

Q   On that -- on that Friday, as I recall, you said, you know, he propositioned you again to -- to go, like, rent a room? Is that what it was, or --

A   No. Like he wanted me to take off work --

Q   Okay.

A   -- to go somewhere.

Q   Okay. So that day ended, had the week -- weekend off. Then what happened after that?

A   Well, the weekend came, and I -- I had the keys, you know, to the building, so I went in and just cleaned out my desk, cleaned everything out. And I just left those flowers on the desk. And, you know, my coworker Employee B told me, she said it was -- she said it was just kind of crazy, you know. Because she said those flowers just sat there and just died, you know. And she said it was -- it was so strange because everybody was, you know, "What's going on?" and -- I don't know. She said it was just strange. And the next week I called Employee C, my supervisor, and asked him to please tell my superiors in San Antonio that -- what happened. Because they knew me. I had a good working relationship with them. I've been down there for training. And I didn't want them thinking

Page 16

that I just left, you know, irresponsibly just left my position, just quit.

Q   So you asked Employee C to tell them why you had left?

A   Exactly.

Q   Okay.

A   So Employee C basically accepted my resignation, and he said, well -- he hesitantly said "Okay." Well, it wasn't too -- He met me in a park and my -- my ex-husband at a park, and he had, like, torn out the -- out of the -- the clerk's manual about sexual harassment and gave it to me, folded it up and brought it to me out at a park somewhere.

Q   Oh, Employee C did?

A   Uh-huh.

Q   Okay.

A   And then -- Can I take a break?

Q   Oh, sure. Let's take a -- what? -- five-, ten-minute break?

A   Yeah.

Complainant:   Okay.

Attorney for the Texas Bar:   Okay.

Complainant:   I'll call you back,

Attorney for the Texas Bar:   All right. Bye.

(Recess from 3:16 p.m. to 3:24 p.m.)

Complainant:   We are back on the record at 3:24 p.m.

Page 17

I think when we left off you were talking about you left the weekend and you had resigned and Employee C met you at the park. What happened after that?

THE WITNESS:   Uh-huh. Well, I had asked Employee C to please tell my superiors in San Antonio that -- what the reason was for my leaving.

Q   COMPLAINANT:   Okay.

A   And he agreed that he would do that. So it was probably not two hours from that time my supervisor from San Antonio called me at home, and he had the -- the director of human resources with him and also the assistant district clerk there, his assistant.

Q   And who was the name of that supervisor? Is that Employee D?

A   Employee D

Q   Employee D?

A   Employee D

Q   Employee D

A   Uh-huh.

Q   Okay.

A   Or Employee D. And he told me that -- he said, "First of all, I want to let you know that Employee C -- and I let him know that he had no right to accept your resignation. That wasn't within his power to do." And he said that was above and beyond his power. And he said that

5   (Pages 14 to 17)

Court Reporters

Page 18

"I've got Employee E here." And I forget the other gentleman's name. There were three of them in the room. And basically he asked me, you know, in detail what happened, and -- and I told him. And he said that he was not going to accept my resignation, that I was a good employee and that this was a traumatic event and that he wanted to put me on six weeks administrative leave with pay to think about it. So he said, you know "If you decide that you want to quit after that," he said, "We understand." But he said, "I don't feel like right now it's -- it would be good for you to just quit because this is a good job." You know, it's a good job for a woman in Waco, you know, without a four-year degree. And I'd worked hard to get that job, you know, the right way. And he knew that. He knew my reputation. And so he said, "I'm --" you know, "So that's what we're going to do, you know, we're going to put you on six weeks' leave." And he said, "After that, you know, we'll go from there, see what you want to do." So --

Q   Again, I don't mean to interrupt you.

A   No.

Q   I believe you told me that sometime while you were on leave you got a call from Judge Smith's law clerk?

A   Yes.

Q   Who was that?

A   Law Clerk

Page 19

Q   How do you spell that?

A   Law Clerk   He was Judge Smith's law clerk, and he called me the week after that. It was, I would say, a week, maybe two -- no, probably two weeks just because of the events that he said has been -- had been happening, it had been -- He said -- he called me at home, and he said, "Witness A," he said, "You need to put some kind of closure on this. You need to do something about this." He said, "The judge is -- I'm having to go pick him up for work. He can't come into work. He's been in the hospital." He said, "He's, you know, falling apart. He's having to cancel court things, and, you know, he's not functioning. You've got to do something about this."

Q   Well --

A   And I said --

Q   So he was suggesting it was your responsibility?

A   Yes.

Q   Okay.

A   And I was like -- I said, "Law Clerk I'm the victim here. He did this to me. Why -- you know, what -- you're not even in your right mind to call and tell me to make things better, you know, about this." And he's like, "Well, you just need to do something because I can't do this anymore." In other words, he was feeling the stress of it.

Q   So what did he say he wanted you to do?

Page 20

A   He -- I don't know. He wanted me to -- to call and make things better, I suppose. I don't know.

Q   Hum.

A   He wanted me to have some kind of contact with the judge because I just left, never said anything, never wrote anything, just left the flowers on the desk, and had no further contact with him. So from the way it sounded, he just basically, you know, lost it, not knowing what I was going to do, I -- I suppose. I don't know. I mean, I would hope he would be thinking uh-oh, you know, by this time. I don't know.

Q   Do you know what kind of -- what he was in the hospital for? Did anybody say?

A   I think he said his blood pressure was up, and -- I don't know --

Q   As I --

A   -- chest pains and --

Q   Okay. As I recall, you -- you said something to me on another occasion about Judge Smith telling other people in the courthouse he was interested in you.

A   Uh-huh.

Q   What -- what did you hear from those other people?

A   Well, I found out that whenever I was first hired -- I at first was hired on at the U.S. Probation Office, and he had told -- that was, like, about four years prior when I

Page 21

started at that building. I worked there for two years, and then I took the job, the position of deputy clerk after about two years. But when I was initially hired -- and I found out this later, that he had told the supervisor that he really liked the last time -- the last hire, you know. And I'm not sure what all he said. But he told me that he, you know, very -- made it very plain that he was very interested and liked -- was -- approved very much of their last hire.

Q   This is Employee C?

A   No. This was a -- my supervisor down in -- he was a U.S. probation officer --

Q   So from what --

A   -- at that time. I -- I went to talk to him because he was the only person that I really trusted. I went to talk to him on that Friday after it happened. And as it turns out, you know, he was like, "Why did you come in here and tell me this? Why are you telling me?" Because the cameras caught me going into his office, and the judge had been in the marshals' office and saw me go into Employee F's office. And he went in there and questioned him as to what I was in there doing, and Mister -- you know, Employee F basically just said I -- "Why -- why did you do that?" He said, "I -- I just couldn't help myself," you know.

Q   Employee F said that --

A   Employee F asked Judge Smith, "Why did you do that to

Court Reporters

March 7, 2014

## Page 22

her?"

Q  Oh. So Judge Smith told Employee F he just couldn't help himself? Is that --

A  (Nodding head)

Q  "Yes"?

A  Yes.

Q  Okay. Did Employee F quote the judge as saying anything else?

A  Huh-uh. He just, you know, made it clear that he, you know, watched me every day coming to work, unbeknownst to me.

Q  That -- that judge Smith watched you coming to work every day?

A  (Nodding head)

Q  Okay.

A  His office faced out. I don't know that he did, but -- I mean, every day, but he watched me. You know, there's cameras in the marshals' office. There's -- his office faced out over the parking lot where I parked, where everybody parked and came in and -- But obviously he knew exactly when I came in because he knew when to buzz my desk, so he was watching me.

**** Redacted - unrelated to the complaint against Judge Smith ****

## Page 23

**** Redacted - unrelated to the complaint against Judge Smith ****

## Page 24

**** Redacted - unrelated to the complaint against Judge Smith ****

Q  Did you volunteer to testify today, or were you subpoenaed?

A  I volunteered.

Q  When --

A  And I was subpoenaed.

Q  When -- when you originally got the subpoena, did you want to testify?

## Page 25

A. Not originally, no.

Q  So you've not -- have -- have you been peddling this story around, or did somebody have to urge you to talk?

A  No. I've been trying to put it behind me. I really -- I was very defensive when I received the subpoena, and I didn't come the first time I was subpoenaed because I didn't want all this. I just didn't want to deal with it again. I didn't want to talk about it. I didn't want to think about it. I didn't want it brought up anymore. I just wanted it gone.

Q  I want to ask you about a letter that you wrote to Judge Smith. Did you -- did you write a letter while you were on leave to Judge Smith?

A  Yes.

Q  And can you describe generally what the letter said?

A  It basically said that I had decided that I was going to return to the clerk's office and resume my position and that I want him to stay away from me and not to bother me, not to talk to me, not to call me, to stay away from me, and, you know, that what he did was wrong. It caused me a lot of anxiety and problems. And I -- I -- I wasn't able to find the letter that I wrote, but I know that I sent a copy of it to Employee D   in San Antonio and to Mister -- Judge X   They both received a copy of that letter. And so I suppose it's in my file somewhere. I don't remember exactly

7 (Pages 22 to 25)

Court Reporters

March 7, 2014

## Page 26

what I said. All I know is I remember what I thought when I wrote it, and it was, you know, stay away from me.

Q   All right. But you ended up resigning anyway afterwards?

A   I did. I went -- I went back, and I caught a lot of flack from other people in the office because they were like, "Oh, Witness A can quit and come back whenever she wants to," you know, just -- between that and them not knowing what was going on and they were angry because I got to come back and I could just leave and come back whenever I wanted to. And also the fact that, you know, I was on the same floor as the judge's office, and anytime that I -- you know, I had a fear of walking out into the hall and running -- running into him.

Q   Are you aware of any other incidents in which Judge Smith has allegedly harassed or assaulted women who work in the courthouse?

A   I had -- I don't know of anything specific.

Q   Have you heard anything secondhand, thirdhand?

A   I know that he did -- I -- I was told he did have a reputation for, you know, pushing himself on whoever he wanted.

Q   I think you mentioned to me on another occasion that there was another woman that worked there in the courthouse that has a similar experience maybe?

A   Yes. But I just -- You know, she --

## Page 27

Q   Was that before or after your -- what happened to you?

A   After what happened to me. I found out a whole lot of things.

Q   What was her name?

A   I just hate to say because I don't want to mess her life up, you know.

Q   I understand.

A   She --

Q   That's -- that's fine.

A   That's her --

Q   Sure.

A   You know --

Q   Sure. That's fine. How did you come to know Manager A?

A   Um --

Q   Actually, let me back up. Who is Manager A?

A   Well, I did not know who he was. I was introduced to him by Employee G

Q   He's the Redacted of McLennan County, isn't he?

A   Uh-huh.

Q   At that time was he a --

A   He --

Q   -- deputy marshal?

A   He was a U.S. marshal, yeah --

## Page 28

Q   Okay.

A   -- deputy U.S. marshal, and he --

Q   He introduced you to

A   Yes. I'm not exactly sure how it kind of all came together other than the fact that Manager A offered to take me to Houston to talk to an attorney to find out if there was anything that could be done about the situation --

Q   Okay.

A   -- when he found out about it. And, of course, you know, Employees G, H were working in the courthouse at the time, so --

Q   Gotcha. So Manager A is the former city manager of Waco?

A   City mayor, yeah --

Q   Okay. You mentioned earlier --

A   -- I believe.

Q   -- Employee F the probation supervisor. What was his first name?

A   Employee F

Q   Employee F?

A   Employee F

Q   Employee F

A   Uh-huh.

Q   Okay.

A   He is no longer with the probation office. He --

## Page 29

Q   Retired, I think.

A   He went to -- he moved to the Bureau of Prisons.

Q   Okay.

A   He moved.

Q   Okay.

A   And he may be retired from that, so -- but I know I put him in a bad position.

Q   Hum.

A   You know, anybody that knew anything --

Q   Right. Let me ask you this. How did -- how has this incident affected your -- affected you since then?

A   It's affected me pretty badly. I went into a pretty deep depression. I had to be hospitalized. It's just caused a lot of stress in my life, but --

Q   Does it still affect you now?

A   Yes.

Q   Has it affected your career?

A   Yes.

COMPLAINANT:   I -- I have no further questions.

### CROSS-EXAMINATION

By Attorney for Texas Bar

Q   Okay. Witness A,

A   Yes.

Q   Okay. Have you had any interaction with Judge

Court Reporters

March 7, 2014

**Page 30**

Walter Smith since 1998?

A   No, sir.

Q   Okay. And after that event with Judge Smith in 1998, when did you first speak with complainant?

A   Within the past few weeks.

Q   So during February of 2014 --

A   Yes.

Q   -- would have been the first time that you spoke with

A   Yes, sir.

COMPLAINANT:   No further questions.

COMPLAINANT:   I believe that's it.

Attorney for Texas Bar: All right. Thank you, Witness A

THE WITNESS: Thank you.

COMPLAINANT:   There we go.

Attorney for Texas Bar: Take care,

COMPLAINANT:   Thank you. You, too. Have a good weekend. We're off record at 3:45 p.m.

(The deposition ended at 3:45 p.m.)

**Page 31**

CHANGES AND SIGNATURE

WITNESS:   WITNESS A   DATE: MARCH 7, 2014

PAGE  LINE  CHANGE        REASON

**Page 32**

I,   Witness A   have read the foregoing deposition and hereby affix my signature that the same is true and correct, except as noted above.

_____

WITNESS A

STATE OF TEXAS       )
COUNTY OF _____ )

Before me, _____, on this day personally appeared   Witness A   known to me or proved to be under oath or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _____, 2014.

_____

NOTARY PUBLIC IN AND FOR THE

**Page 33**

CAUSE NO.

COMMISSION FOR LAWYER   X   IN THE DISTRICT COURT
DISCIPLINE,           X
                      X
Plaintiff,            X
                      X
VS.                   X   380th JUDICIAL DISTRICT
                      X
COMPLAINANT           X
                      X
Defendant.            X   COLLIN COUNTY, TEXAS

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
MARCH 7, 2014

I,   Court Reporter   Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness,   Witness A   was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was duly submitted on _____, 2014, to the attorney for the witness for examination, signature and return to me by _____, 2014.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

Attorney for Texas Bar -- 0 hrs. 1 min.

Complainant - 0 hrs. 44 mins.

9  (Pages 30 to 33)

Court Reporters

March 7, 2014

Page 34

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:
Attorney for Texas Bar  Attorney for Plaintiff, Complainant,        Defendant Pro Se;
I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be complied with after they have occurred.

Certified to by me on this _____ day of _____, 2014.

Court Reporter's signature

Page 35

FURTHER CERTIFICATION UNDER RULE 203 TRCP
ORAL DEPOSITION OF  Witness A
MARCH 7, 2014

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to  Complainant  , Custodial Attorney;

That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 2014.

10 (Pages 34 to 35)

Court Reporters

February 12, 2014

Page 1

IN THE 380TH JUDICIAL DISTRICT COURT
COLLIN COUNTY, TEXAS

COMMISSION FOR LAWYER      )
DISCIPLINE,                )
          Plaintiff,       )
                           )      Cause No.
VS.                        )
                           )
COMPLAINANT                )
          Defendant.       )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

WITNESS B

FEBRUARY 12, 2014

VOLUME 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF   WITNESS B   , produced as
a witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and -numbered cause
on the 12th of February, 2014, from 2:42 p.m. to
2:54 p.m., via telephone, before   Court Reporter   in
and for the State of Texas, reported by machine
shorthand, at the offices of   Court Reporters,
Court Reporter's address                   pursuant to
the Texas Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

Court Reporters

February 12, 2014

Page 2

APPEARANCES

FOR THE PLAINTIFF:

Attorney for Texas Bar

FOR THE DEFENDANT:

Mr. Complainant (Via Telephone)
Attorney at Law

Page 4

having been first duly sworn, testified as follows:

EXAMINATION

BY COMPLAINANT:

Q. Witness B will you state your full name.

A. Witness B

Q. And, Witness B what's your occupation?

A. I'm a firefighter for the City of Waco.

Q. And do you live there in Waco?

A. Yes, just -- just outside of the city limits.

Q. Okay. And it's my understanding that you were previously married to Witness A

A. That's correct.

Q. And that's -- her first name is spelled Witness A.

A. Yes.

Q. What was her maiden name?

A. Witness A

Q. And I believe she's now known as is that correct?

A. That's correct.

Q. When were you married to Witness A?

A. From 1998 to 2005.

Q. I want to ask you some questions about U.S. district judge Walter Smith, Jr.

Page 3

INDEX

                                    PAGE

Appearances.................... 2

Stipulations.................. 4

Examination by Mr.Complainant ...... 4

Reporter's Certificate .............. 13

Page 5

Are you aware of any alleged assault on by Judge Walter Smith?

A. Yes.

Q. When did that happen?

A. I don't remember the date exactly. It was probably around 1998.

Q. Was it before or after you were married?

A. After.

Q. Okay. What time -- do you remember what time of year it was?

A. No, I don't.

Q. Can you describe roughly what happened, according to your understanding.

A. What I was told by her is that they had crossed paths in the hallway at the federal courthouse and she had smiled and said hi and he said hi also, and during the exchange, he told her to come see him. And a little bit later, he called because I believe she didn't take him seriously, and he called and asked her why she hadn't come over to his office because he was expecting her, and so she did. There was a job opening in his office at the time, so she thought that it was something related to that possibly.

So when she went into his office, he began hugging her, he groped her breast, her butt and

2 (Pages 2 to 5)

Court Reporters

February 12, 2014

## Page 6

kissed her at some point during the -- during all the events.

Q. Did she say she was resisting this?

A. She said that she pushed him away and told him that she couldn't do anything like that with him because she was married.

Q. And did she describe anything he said?

A. I don't recall at that point. I think that he tried to coerce her some, but I don't remember any further on the conversation.

Q. In terms of coercion, was it your understanding that was something said verbally or something done physically or both?

A. I know, you know, that at one point he was hugging her and I don't know if -- if it was more of him trying to talk her into it, or physically.

Q. And this happened, you said, in his office?

A. Yes.

Q. Were there any other witnesses?

A. There was a secretary outside of his office, but I don't believe there was anyone else in the room.

Q. Do you have -- have any knowledge of whether the secretary heard or saw anything?

A. Other than Witness A coming and going, I don't know. She said she felt like the secretary was looking

## Page 7

at her oddly, but she doesn't know if she heard anything or not.

Q. Do you know the secretary's name?

A. I do not recall.

Q. Okay. Was any -- I'm sorry. Go ahead.

A. After this happened, she went back to her office and then that evening is when she told me about it. The next day when she got to work, there was a bouquet of flowers on her desk with an unsigned card. And then Witness A called his office to see if they were from him and he said that they were from him and he again was trying to talk her into having an affair with him, I guess you'd say, and offered to get a room somewhere and she declined.

Q. Okay. Was there any other communications after that?

A. Later -- I told her to not go back to work, and she later sent a registered letter to him saying that she was just trying to do her job, she didn't appreciate that, that it was inappropriate. She did at some point in time talk with her supervisor -- he's the district clerk there, Employee C -- and made him aware of it.

And his boss out of San Antonio, who I don't remember his name, but he was also made aware of

## Page 8

it, and they put her on administrative leave for a period of time before she finally decided to finally terminate her job there.

Q. Do you know if the incident was reported to anyone outside the clerk's office?

A. Yes. I'm not sure who -- at whose suggestion it was. I'm thinking it was the man out of San Antonio, but Witness A called and spoke with the senior judge out in -- I think it's in Lubbock -- I don't remember his name --

Q. Okay.

A. -- and told him of the event. And his reply was basically, What do you want me to do about it? So she got --

Q. Really?

A. -- no help or support out of him.

Q. So it was your understanding he basically was not interested in doing anything?

A. Correct.

Q. Okay. Was anyone else notified?

A. That is -- that's the only people I can remember right now.

Q. Are you aware of any investigations, like, by the judicial council or the police or anybody like that?

A. No.

## Page 9

Q. Did -- did Witness A hire an attorney?

A. No. She did at one -- at one time speak with an attorney that was recommended, and I believe he was out of Houston. I don't recall his name for certain.

Q. Okay. And do you -- did she actually speak with him or do you know?

A. She did speak with him. A former city manager for Waco, Manager A, had encouraged her to talk to him, and I believe he and his wife drove her down there to see him.

Q. Okay. Did anything come out of that or was that the end of it?

A. I believe that was the end of it. There was a report of another female in the office that something had happened to similar and she was still employed there and refused to get involved in it, so I think they felt they didn't have much of a case at the time.

Q. Do you know who the other female was?

A. It's been so long, I don't remember her name.

Q. Okay. So to your knowledge, no lawsuits were filed?

A. Correct.

Q. Were any letters sent by any attorney or anyone else regarding the incident?

A. Not that I'm aware of.

3 (Pages 6 to 9)

Court Reporters

February 12, 2014

Page 10

Q. Had anyone other than me contacted you about this deposition?

A. Witness A sent me a text message yesterday regarding it.

Q. What did she say in the text message?

A. If you'd like, I can read it for you from my phone.

Q. Sure. That would be fine.

A. She said, "I was able to speak with the attorney who is representing the State Bar of Texas against Complainant and he said he is not even going to be at the deposition tomorrow. It would be good if you could contact him because he could answer any questions you have on bias. Complainant is being sued for misconduct, and he's just grabbing at straws to take the heat off himself.

"Judge Smith knows about the deposition set up tomorrow, and to tell you the truth, I think he is capable of doing anything to keep it from happening. I'm not going, and I asked that you please be careful if you go. Despite the threat about not showing up on the subpoena, no action will be taken against us for not showing up.

Complainant may file a motion to compel, but I am working on getting a motion to quash a subpoena

Page 11

for both of us. Call if this doesn't make sense. Okay. The state's attorney is Attorney and has his phone number.

Q. So that's a text message from her?

A. Yes.

Q. What is her telephone number?

A. Redacted

Q. Did anyone else contact you about the deposition?

A. Her mother contacted me and asked me to contact her, but that was the extent of that.

Q. Okay. Do you know why Witness A would say that she thought Judge Smith was capable of anything?

A. She probably is concerned -- knowing that he has a lot to lose. I don't know if there's been any threats. I think she's probably just afraid of him because of the power that he has.

Q. Do you know whether she ever had any threats in the past from him?

A. No, I do not.

Q. Did you -- have you heard any information about how she would know that Judge Smith is aware of the deposition?

A. No.

Q. Was there ever a confrontation between you and

Page 12

Judge Smith?

A. No, there wasn't.

Q. Have you ever talked to Judge Smith?

A. No, I have not.

COMPLAINANT: I don't believe I have any more questions.

Attorney for Texas Bar: No questions.

COMPLAINANT: I believe that's it,

Thank you for your cooperation.

THE WITNESS: Okay.

(Deposition concluded at 2:54 p.m.)

Page 13

IN THE 380TH JUDICIAL DISTRICT COURT
COLLIN COUNTY, TEXAS

COMMISSION FOR LAWYER )
DISCIPLINE, )
　　　Plaintiff, )
　　　　　　　　　　　) Cause No.
VS. )
　　　　　　　　　　　)
COMPLAINANT, )
　　　Defendant. )

REPORTER'S CERTIFICATE
DEPOSITION OF Witness B
FEBRUARY 12, 2014

I, Court Reporter, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, Witness B was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That examination and signature of the witness to the deposition transcript was waived by the witness and agreement of the parties at the time of the deposition;

That the original deposition was delivered to Mr. Complainant;

That the amount of time used by each party at the deposition is as follows:

Attorney for Texas Bar· 0:00
　　　Complainant - 0:12

4  (Pages 10 to 13)

Court Reporters

February 12, 2014

Page 14

That $_____$ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Attorney for Texas Bar  Attorney for Plaintiff,

Mr. Complainant,  Attorney for Defendant.

That a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk pursuant to Rule 203.3.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this \_\_\_\_\_ day of _____, 2014.

Court Reporter's signature

5  (Page 14)

Court Reporters

Att. 1 _Reply (Depo.)
**15 of 15**